1   Ben F. Pierce Gore (SBN 128515)
    PRATT & ASSOCIATES
2   1871 The Alameda, Suite 425
    San Jose, CA 95126
3   Telephone: (408) 429-6506
    Fax: (408) 369-0752
4   pgore@prattattorneys.com

5   *Attorneys for Plaintiffs*

6           IN THE UNITED STATES DISTRICT COURT

7        FOR THE NORTHERN DISTRICT OF CALIFORNIA

8                SAN FRANCISCO DIVISION

9
    MARKUS WILSON and DOUG            Case No. 3:12-cv-01586-SC
10  CAMPEN, individually and on behalf of all
    others similarly situated,        **PLAINTIFFS' MEMORANDUM OF**
11                                     **POINTS AND AUTHORITIES IN**
                    Plaintiffs,        **OPPOSITION TO DEFENDANTS'**
12                                     **MOTION TO DISMISS THE**
    v.                                 **AMENDED COMPLAINT**
13
    FRITO-LAY NORTH AMERICA, INC.
14  AND PEPSICO, INC.,                 Hearing Date:   February 8, 2013
                                       Time:           9:00 a.m.
15                  Defendants.        Place:          Courtroom 1

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2 TABLE OF AUTHORITIES ................................................................................................. ii

3 STATEMENT OF ISSUES TO BE DECIDED ................................................................... v

4 INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 1

5 FACTUAL ALLEGATIONS ............................................................................................... 2

6 ARGUMENT ....................................................................................................................... 3

7 I.  PLAINTIFFS HAVE STANDING TO MAKE ALL OF THE CLAIMS ALLEGED ........ 3

8 II.  PLAINTIFFS HAVE PROPERLY PLEADED CLAIMS AGAINST PEPSICO, INC. ..... 4

9 III.  PLAINTIFFS' HAVE ADEQUATELY PLEADED CLAIMS UNDER THE UCL, FAL
   AND the CLRA ........................................................................................................... 5

10  A.  Defendants' "Reasonable Consumer" Arguments Are Misplaced ............................... 6

11  B.  Defendants' "Reasonable Consumer" and Preemption Arguments
12       Have No Merit ........................................................................................................ 7

13  1.  "0 Grams Trans Fat" .......................................................................................... 7

14  2.  "No MSG" Claim ............................................................................................. 16

15  3.  Websites Referenced On Product Labels Constitute Labeling ......................... 19

16  4.  Claims Related To Sodium Content .................................................................. 19

17  5.  Claims Related To "Nutrient" Content .............................................................. 20

18  6.  Defendants' Unlawful Health and "Healthy" Claims ....................................... 21

19  7.  Claims related to "All Natural" ......................................................................... 23

20 IV.  PLAINTIFFS' AMENDED COMPLAINT COMPLIES WITH RULE 9(b) ..................... 24

21 V.  PLAINTIFFS HAVE PROPERLY PLEADED UNJUST ENRICHMENT ..................... 25

22 CONCLUSION .................................................................................................................. 26

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Am. Farm Bureau v. U.S. E.P.A.,*
    121 F. Supp. 2d 84 (D.D.C. 2000) ...........................................................................................9

*Anderson v. Jamba Juice Co.,*
    2012 WL 3642835 (N.D. Cal. Aug. 25, 2012) .........................................................................9

*Appalachian Power Co. v. E.P.A.,*
    208 F.3d 1015 (D.C. Cir. 2000) ...............................................................................................9

*Astiana v. Ben & Jerry's Homemade, Inc.,*
    2011 WL 2111796 (N.D. Cal. May 26, 2011)........................................................................ 3, 6

*Astiana v. Dreyer's Grand Ice Cream, Inc.,*
    2012 WL 29907660 (N.D. Cal. July 20, 2012) .................................................................. 4, 23

*Baas v. Dollar Tree Stores, Inc.,*
    2007 U.S. Dist. LEXIS 65979 (N.D. Cal. Aug. 29, 2007) .......................................................24

*Bassiri v. Xerox Corp.,*
    463 F.3d 927 (9th Cir. 2006).............................................................................................. 8, 18

*Briseno v. Conagra Foods, Inc.,*
    No. 2:11-cv-05379 MMM-AGR, Slip. Op. (C.D. Cal. Nov. 23 2011) .......................................6

*Brooks v. ComUnity Lending, Inc.,*
    2010 U.S. Dist. LEXIS 67116 (N.D. Cal. Jul. 6, 2010)...........................................................24

*Carrea v. Dreyer's Grand Ice Cream, Inc.,*
    475 F. App'x 113 (9th Cir. 2012) ...........................................................................................15

*Colucci, et al. v. Zoneperfect Nutrition Co.,*
    2012 WL 6737800 (N.D. Cal. Dec. 28, 2012)................................................................. *passim*

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.,*
    35 Cal. 3d 197 (1983).............................................................................................................5

*Delacruz v. Cytosport, Inc.,*
    2012 WL 2563857 (N.D. Cal. June 28, 2012) ........................................................................13

*Jones, et al. v. Conagra Foods, Inc.,*
    2012 WL 6569393 (N.D. Cal. Dec. 17, 2012.)................................................................... 2, 25

*Kasky v. Nike, Inc.,*
    27 Cal. 4th 939 (2002) ...........................................................................................................5

*Khasin v. The Hershey Co.,*
    2012 WL 5471153 (N.D. Cal. Nov. 9, 2012) ..................................................................2, 6, 15

*Kwikset Corp. v. Superior Court,*
    51 Cal. 4th 310 (2011) ...........................................................................................................1

*Larsen v. Trader Joe's*,
    2012 WL 5458396 (N.D. Cal. 2012)...................................................................................4

*Loreto v. Procter & Gamble Co.*,
    737 F. Supp. 2d 909 (S.D. Ohio 2010)............................................................................ 15

*Medrazo v. Honda of North Hollywood*,
    2012 Cal. App. LEXIS 2316 (Cal. App. March 21, 2012)................................................6

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*,
    104 Cal. App. 4th 508 (2002) ..........................................................................................5

*People v. Wahl*,
    30 Cal. App. 2d Supp. 771 (Cal. App. Dep't Super Ct. 1940) ..................................... 12

*Peviani v. Hostess Brands, Inc.*,
    750 F. Supp. 2d 1111 (C.D. Cal. 2010) ...........................................................................9

*Polk v. KV Pharm. Co.*,
    2011 WL 6257466 (E.D. Mo. Dec. 15, 2011) ............................................................... 15

*Public Lands for the People, Inc. v. United States Dep't of Agric.*,
    2012 U.S. App. LEXIS 20175 (9th Cir. 2012) ........................................................ 8, 18

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006)............................................................................................9

*Saunders v. Superior Court*,
    27 Cal. App. 4th 832 (1994).............................................................................................5

*Truth In Labeling Campaign v. Shalala*,
    999 F. Supp. 1289 (E.D. Mo. 1998) ......................................................................... 17, 19

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ....................................................................................... 24

*Vicuna v. Alexia Foods, Inc.*,
    2012 WL 1497507 (N.D. Cal. April 27, 2012) .............................................................. 25

*Von Koenig v. Snapple Beverage Corp.*,
    713 F. Supp. 2d 1066 (E.D. Cal. 2010) ........................................................................ 6, 9

**Statutes**

15 U.S.C. § 2301............................................................................................................... 25

21 U.S.C. § 301...................................................................................................................1

21 U.S.C. § 343(a) ..............................................................................................................2

Cal. Bus. & Prof. Code § 17200.........................................................................................1

Cal. Bus. & Prof. Code § 1750.......................................................................................1, 5

Cal. Bus. & Prof. Code § 17500.....................................................................................1, 5

Cal. Civ. Code § 1790 ................................................................................................................ 25

Cal. Health & Safety Code § 109875 ........................................................................................1

Cal. Health & Safety Code § 110660 ........................................................................................2

Cal. Health & Safety Code § 110740 ...................................................................................... 24

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................................................. 22

**Regulations**

21 C.F.R. § 1.21 .............................................................................................................. 10, 13

21 C.F.R. § 101.22 ......................................................................................................... 17, 23

21 C.F.R. § 101.61 .................................................................................................................. 20

21 C.F.R. § 101.65(d) ............................................................................................................. 22

21 C.F.R. §101.13 .................................................................................................................. 14

21 CFR § 101.22 .................................................................................................................... 18

21 U.S.C. § 321(k) ................................................................................................................. 19

21 U.S.C. § 321(m) ................................................................................................................ 19

58 F.R. 2302 ................................................................................................................ 10, 11, 23

58 F.R. 2303 ........................................................................................................................... 10

58 F.R. 2307 ..................................................................................................................... 10, 11

64 F.R. 62746 ......................................................................................................................... 11

64 F.R. 62748 ......................................................................................................................... 11

# STATEMENT OF ISSUES TO BE DECIDED

**Article III/Standing:**

1. Whether Plaintiffs have standing to represent a class where products that they did not purchase are similar and misbranded in the same manner as the products they purchased.

2. Does delving into what a reasonable consumer would rely on and determining whether Plaintiffs were or were not deceived by Defendants' product labeling raise questions of fact that are beyond the scope of a Rule 12(b)(6) motion?

**PepsiCo, Inc. Liability:**

3. Whether Plaintiffs' Amended Complaint states a claim against PepsiCo, Inc. where PepsiCo markets Frito-Lay's products and jointly makes unlawful product claims.

**Plausibility (*Iqbal/Twombly*):**

4. When a product label is unlawful under California law, can a Court say, as a matter of law, that it is not plausible that a consumer would be misled by and detrimentally rely on the misleading label?

5. Are Plaintiffs required to plead claims with even more particularity than that required by Rule 9(b)?

6. When a misbranded product cannot be legally sold or held and it is a strict liability crime to do either, is it plausible that Plaintiff and members of the class who purchased such a misbranded product for valuable consideration have been  injured by the unlawful sale to them of goods that were illegal to sell to them and illegal for them to hold or resell?

7. Is it plausible that said injury was attributable to the unlawful acts of Defendants?

**Preemption:**

8. Does a preemption provision that expressly preempts only state requirements "that [are] not identical to" the federal requirements imply that Congress also intended to preempt state requirements that are identical to the federal requirements?

9. Is the Court not competent to determine whether a state requirement is identical to a federal requirement?

**Individual Causes of Action:**

10. Do Plaintiffs' allegations that, as a result of misleading advertising and labels, they purchased products that they would not otherwise have purchased and paid more than they otherwise would have paid, fail to state a claim under California's false advertising and consumer protection laws?

11. Is a claim for "Restitution Based on Unjust Enrichment/Quasi Contract" subject to dismissal for failure to state a claim on the theory that California does not recognize an independent cause of action for unjust enrichment?

12.  Did Plaintiffs fail to adequately allege facts necessary to state warranty claims under the Magnuson-Moss Act and the Song-Beverly Act?

1

**INTRODUCTION AND SUMMARY OF ARGUMENT**

2

"Simply stated:  labels matter.  The marketing industry is based on the premise that labels

3

matter, that consumers will choose one product over another similar product based on its label and

4

various tangible and intangible qualities . . ."  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328

5

(2011).  California has recognized this public policy concern in enacting the Unfair Competition Law,

6

Cal. Bus. & Prof. Code § 17200 ("UCL"); the False Advertising Law, Cal. Bus. & Prof. Code § 17500

7

("FAL"); and the Consumer Legal Remedies Act, Cal. Bus. & Prof. Code § 1750 ("CLRA").  The

8

UCL's substantive provisions were framed in "broad, sweeping language." *Kwikset,* at 320. The FAL

9

is "equally comprehensive" in addressing false and misleading advertising.  *Id.*  The CLRA prohibits

10

any "unfair methods of competition and unfair or deceptive acts or practices."  Cal. Bus. & Prof.

11

Code § 1750. The scope of these laws include not only plain and ordinary acts of deception, they also

12

include acts which are expressly prohibited as unlawful.  Plaintiffs' claims include both.

13

First, the "*misbranding*" part.  Plaintiffs allege that Defendants' package, label and market

14

"misbranded" food products.  These acts are unlawful and unfair and, standing alone without any

15

allegations of deception, give rise to various claims for relief, including relief under the unlawful and

16

unfair prongs of California's UCL and the CLRA.  Plaintiffs' Amended Complaint ("AC") describes

17

in detail Defendants' violations of specific sections of California's Sherman Food, Drug and

18

Cosmetic Act, Cal. Health & Safety Code § 109875 *et seq.* (the "Sherman Law"), which adopts, and

19

hence mirrors, the federal Food Drug & Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA").  The law is

20

clear:  Misbranded food cannot be legally manufactured, advertised, distributed, sold or held. In fact,

21

Defendants do not argue otherwise.  Misbranded food has no economic value and is worthless *as a*

22

*matter of law.*

23

Second, the "*deceptive*" part.  Plaintiffs allege that Defendants' packaging and labels are

24

misleading, deceptive, fraudulent and unlawful.  Plaintiffs' AC comprehensively alleges the falsity,

25

deception and unlawfulness of Defendants' package labels, product placement and website claims.

26

Plaintiffs allege that they relied on Defendants' misrepresentations, and were thereby deceived in

27

deciding to purchase Defendants' products.

28

Defendants' motion recycles arguments that have been rejected by this Court and others in

the Northern District of California.  On December 28, 2012, this Court rejected similar standing, reasonable consumer, plausibility, particularity and unjust enrichment arguments in *Colucci, et al. v. Zoneperfect Nutrition Co.*, 2012 WL 6737800 (N.D. Cal. Dec. 28, 2012).[1]

Defendants' arguments are essentially that no reasonable consumer could possibly be deceived or misled by their unlawful labels.  These arguments clearly raise issues of fact on the misleading aspect of the case that cannot be resolved in a motion to dismiss. More importantly, Defendants miss the point.  Plaintiffs' AC is also based on violations of the California Sherman Law, which again incorporates the FDCA, by Defendants.  When Defendants do address the unlawful claims, they mischaracterize them as merely technical and minor.  This argument is strained in light of the large body of FDA guidance and warning letters to industry, as set out in the AC.  The remainder of Defendants' arguments focuses on claims that Plaintiffs' AC fails to satisfy Rule 9(b). Plaintiffs' AC, however, sets out the "who, what, when, where" and how Defendants' unlawful statements make the products misbranded as a matter of law.  Defendants cannot meet their burden to show that these claims should be dismissed.

## FACTUAL ALLEGATIONS

In their AC, incorporated herein by reference, Plaintiffs have detailed Defendants' systematic practice of placing unlawful and misleading labels on Defendants' products, on their websites, and in their advertising.

Food manufacturers are required to comply with federal and state laws that govern the labeling of food products, and Defendants are very familiar with these laws. First and foremost among these laws is the FDCA and its labeling regulations. The California legislature adopted the requirements of the FDCA in the Sherman Law.  Under both the Sherman Law and FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or in its labeling.  California Health & Safety Code § 110660; 21 U.S.C. § 343(a). Under the FDCA, the term "false" has its usual meaning of "untruthful," while

---

[1] On November 9, 2012, Judge Davila denied a similar motion in *Khasin v. The Hershey Co.*, 2012 WL 5471153 (N.D. Cal. Nov. 9, 2012).  That decision addressed Defendants' arguments regarding the reasonable consumer standard, standing, plausibility, particularity, preemption and unjust enrichment. On December 17, 2012, Judge Breyer made substantially identical rulings on these same issues in *Jones, et al. v. Conagra Foods, Inc.*, 2012 WL 6569393 (N.D. Cal. Dec. 17, 2012.)

the term "misleading" is a term of art. Misbranding reaches not only false claims, but also those claims that might be technically true, but are still misleading. If any single representation in the labeling is misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

Defendants' unlawful conduct includes, but is not limited to, the following:

- Misbranding their products by using labeling and advertising their products as "All Natural" despite their containing artificial or unnatural ingredients, flavorings, coloring, and/or chemical preservatives.

- Misbranding numerous products by using labels that say "0 Grams Trans Fat" despite containing disqualifying levels of fat.

- Misbranding numerous products by labeling or advertising as having "No MSG" despite containing MSG.

- Misbranding their products by representing them as being "low sodium" despite their having more than 140 mgs of sodium per serving size and per 50 grams.

- Misbranding their products by labeling or advertising them as healthy despite containing disqualifying nutrient levels.

- Misbranding by labeling or advertising them with an unauthorized health claim.

Each of the misbranded products described in the AC contains one or more of these unlawful and misleading claims.

## ARGUMENT

## I.   PLAINTIFFS HAVE STANDING TO MAKE ALL OF THE CLAIMS ALLEGED

Defendants contend that Plaintiffs do not have standing to assert claims regarding products they did not purchase. Plaintiffs have standing to represent a class even on products they themselves did not purchase, so long as there is sufficient similarity between the products purchased and not purchased. This Court rejected this argument in *Colucci*, 2012 WL 6737800, at *4-5. The Court correctly concluded that where there is sufficient similarity between products purchased by a class representative and those not, the plaintiff has standing.[2] The Court noted that differences in flavors,

---

[2] *See also, Astiana v. Ben & Jerry's Homemade, Inc.*, 2011 WL 2111796, at *5 (N.D. Cal. May 26, 2011) (denying motion to dismiss "claims asserted by Plaintiffs to the extent they are based on ice cream products that Plaintiffs themselves did not purchase" because plaintiffs "alleged sufficient similarity between the products they did purchase and those that they did not").

ingredients lists would not preclude standing where there is sufficient similarity with respect to the common labeling claims.  Here, there is a sufficient similarity between the Defendants' chips and snack products which Plaintiffs specifically alleged they purchased and the Defendants' other chip and snack products which Defendants contend Plaintiffs did not purchase. Defendants market their chip and snack products through their website which reflects that they are, with the exception of flavor, substantially similar with similar ingredients. Plaintiffs bought a variety of Defendants' potato chips, Cheetos and Fritos which as detailed in the AC shared similar unlawful labeling claims across the board.  As such Plaintiff has standing to pursue claims against the Defendants other  varieties of potato chips, corn based snacks like Cheetos and Fritos and other types of salty snacks all of which come in similar packaging and bear similar labeling claims. Plaintiffs have pled that "Defendant engaged in identical unlawful practices with respect to all of its Misbranded Products."  (AC ¶ 4.) Furthermore, as the court noted in *Dreyer's Grand Ice Cream, Inc.*, "any concerns… about material differences are better addressed at the class certification stage rather than at the 12(b)(6) stage." *Astiana v. Dreyer's Grand Ice Cream, Inc.*, 2012 WL 29907660, at *13 (N.D. Cal. July 20, 2012).

The Court's ruling in *Colucci* is correct and applicable here, in contrast to the cases cited by Defendants. As noted by the Court in *Dreyer's Grand Ice Cream, Inc.*, *Larsen v. Trader Joe's*, 2012 WL 5458396 (N.D. Cal. 2012) is distinguishable. In *Larsen*, the plaintiffs challenged a "wide range of products (cookies, apple juice, cinnamon rolls, biscuits, ricotta cheese, and crescent rolls) which bear little similarity." *Dreyer's Grand Ice Cream, Inc.*, 2012 WL 2990766, at *13. Unlike *Larsen*, Plaintiffs challenge the Defendants' claims made across its salty chip and snack product line, products which are substantially similar with similar ingredients, and which are unlawfully labeled in the same manner, therefore involving the same wrongful conduct.

## II. PLAINTIFFS HAVE PROPERLY PLEADED CLAIMS AGAINST PEPSICO, INC.

Defendant PepsiCo, Inc. contends that Plaintiffs have alleged no facts against it and that all claims against it must, therefore, be dismissed.  This is incorrect. Plaintiffs have alleged throughout the entire AC that <u>both</u> Frito-Lay and PepsiCo have unlawfully misbranded the subject products. Plaintiffs have alleged that PepsiCo and Frito-Lay "manufacture[d], markete[d] and [sold]" the

misbranded food products.  Plaintiffs have specifically alleged that PepsiCo, along with Frito-Lay, misbranded their labels for monetary gain. (AC ¶ 3). In the context of this Rule 12(b)(6) motion, of course, all of Plaintiffs' allegations must be taken as true. Moreover, Plaintiffs alleged that Defendants participated in a common "health and wellness" strategy directed by Pepsi to promote Frito-Lay products. (AC ¶¶ 2-4).

Moreover, PepsiCo advertises and makes unlawful product claims (including, healthy, 0 g Trans Fat, and "all natural" claims about Frito-Lay's products on PepsiCo's own website which itself directs consumers to the linked Frito-Lay website and thus has itself engaged in the unlawful behavior at issue here. *See* Plaintiff's Response to Request for Judicial Notice. Frito-Lay's website, referenced in the product labels, also provides a link to PepsiCo's website.  Plaintiffs' claims are not based on PepsiCo's status as a mere corporate parent, but rather on the allegation that PepsiCo jointly and unlawfully labeled the misbranded products.

## III.   PLAINTIFFS' HAVE ADEQUATELY PLEADED CLAIMS UNDER THE UCL, FAL AND THE CLRA

The UCL prohibits three types of wrongful business practices: any (1) unlawful, (2) unfair, or (3) fraudulent business practice or act.   Plaintiff pleads all three.  "[I]n essence, an action based on Business and Professions Code § 17200 to redress an unlawful business practice 'borrows' violations of other laws and treats these violations, committed pursuant to business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder."  *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515 (2002). The violation of almost any federal, state, or local law, *i.e.*, the Sherman Law, may serve as the basis for a UCL claim. *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994).  Lack of deception, however, is no defense to a Cal. Bus. & Prof. Code § 17200 unlawful business practices claim.

The FAL prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17500. "'Any violation of the false advertising law necessarily violates' the UCL." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002).  The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Bus. & Prof. Code § 1750.

Defendants' Motion to Dismiss focuses almost exclusively on the misleading prong, making arguments that have already been rejected by this Court. *Colucci,* 2012 WL 6737800, at *7. In addition, however, Defendants' motion must be denied because Defendants' labels clearly violate California law. Defendants make little effort to address the unlawful claims, other than to characterize the violations as "one-word differences" and "technical." As demonstrated below, the violations are substantial and consequential.

### A.    Defendants' "Reasonable Consumer" Arguments Are Misplaced

When Defendants finally acknowledge the unlawful aspect of the claim, they only argue that the claim is implausible and that no "reasonable consumer" could possibly have been misled. (Br. at 5). That is not the test. As noted throughout, the "reasonable consumer" requirement does not apply to the UCL "unlawful" claim. Even if it did, it would remain an issue of fact.

Although Plaintiffs' false advertising claim is subject to the "reasonable consumer" standard, this Court, like many others, has properly recognized that this issue is one of fact, not appropriately decided in the context of a 12(b)(6) motion. *Colucci*, 2012 WL 6737800, at *7. The Court's approach to this issue, as stated in *Colucci,* is absolutely correct.[3] These are fact intensive issues, not suitable for a decision at the motion to dismiss stage. *See Hershey*, 2012 WL 5471153, at *7 ("The Court rejects this argument simply because the issues Defendant raises ultimately involve questions of fact as to whether Plaintiff was or was not deceived by the labeling; this argument is beyond the scope of this Rule 12(b)(6) motion.").

Second, but perhaps more importantly, *the "reasonable consumer" test is inapplicable to a UCL claim under the unlawful prong* because reliance and deception are not elements of that claim and lack of deception is no defense to a Cal. Bus. & Prof. Code § 17200 unlawful business practices claim. *Medrazo v. Honda of North Hollywood*, 2012 Cal. App. LEXIS 2316, at *21 (Cal. App. March 21, 2012).

---

[3] Other courts have reached the same conclusion regarding when and how to apply the "reasonable consumer" standard to the false advertising claim. In each case, courts denied motions to dismiss. *See Williams*, 552 F.3d at 938-39 (representations that defendant's products were made with "fruit juice and other all natural ingredients"); *Ben & Jerry's*, 2011 WL 2111796, at *4 (alkalized cocoa in ice cream and frozen yogurt labeled "all natural"); *Briseno v. Conagra Foods, Inc.*, No. 2:11-cv-05379 MMM-AGR, Slip. Op. at 21 (C.D. Cal. Nov. 23 2011) (genetically modified organisms in defendant's cooking oil labeled "100% all natural"); *Von Koenig v. Snapple Beverage Corp.*, 713 F. Supp. 2d 1066, 1071, 1079-80 (E.D. Cal. 2010)(high fructose corn syrup in beverages labeled "All Natural").

**B.    Defendants' "Reasonable Consumer" and Preemption Arguments Have No Merit**

Even if the Court applies the reasonable consumer test at this early stage, Defendants' motion fails.  Plaintiffs' AC more than adequately pleads that a reasonable consumer would be deceived by Defendants' unlawful and misleading claims. Defendants' arguments regarding plausibility have been expressly rejected by the Court in *Colucci*, 2012 WL 6737800, at *7. In addition, Plaintiffs' claims are not preempted as they are based on California law which mirrors FDA regulations.

**1.    "0 Grams Trans Fat"**

First, it should be clear that the "0 grams Trans Fat" label on the Lay's Classic Potato Chip bag purchased by Plaintiff Markus Wilson, and attached to Plaintiffs' first Complaint, filed on March 29, 2012, is different from the label proffered by Defendants in connection with their motion to dismiss. Neither label, however, conforms with the requirements of California law. The label used by Defendants at the time of Plaintiff Markus Wilson's purchase appears to have <u>no</u> disclosure required by law. Defendants have apparently altered the label, but in a manner that still fails to be lawful and which continues to therefore mislead consumers. Both labels fail to provide the disclosure required by California law.

In trying to argue that that their nutrition labeling with respect to their trans fats claims on their chips was truthful and non-misleading, Defendants completely disregard the express disclosure obligations of 21 C.F.R. § 101.13(h) that were enacted to prevent consumers from being misled by claims like the Defendants'.  Defendants disingenuously argue that no reasonable consumer could have been misled by Defendants' utilization of its "0 Grams Trans Fat" claim on the front of the product's packaging without making the front of package disclosure statements about fat mandated by law (21 C.F.R. § 101.13(h)) to apprise consumers that the product contained deleterious items at levels the FDA deemed sufficient to increase the risk of a diet related disease or condition when such a failure  misbrands the products rendering them illegal to sell, buy or possess.

Defendants attempt to minimize their failure to comply with the law, describing it as a "one word difference." (Br. at 9).  The FDA and California do not consider failure to follow the rule to be

insignificant and trivial.  The rule regarding disclosure, as set out above, is clear:  where a "0 Grams Trans Fat" claim is made, the manufacturer is required to disclose the nutrient which exceeds the specified level.  Defendants' have failed to follow the rule and have either failed to make the mandated disclosure at all (notwithstanding Defendants misleading submission of labeling different than the labeling of the potato chips purchased by Plaintiffs) or instead misdirected Plaintiffs and other consumers to a part of the label detailing an a different nutrient that is only present at a modest non-alarming amount that is low and beneath regulatory action threshholds that were triggered by the undesirable nutrient concealed by Defendants' unlawful practices.  Defendants' label is unlawful and misleading and the consequences are not trivial. The total fat in the products is eight times more than the saturated fat and double the percentage and well above the limit for a disqualifying nutrient claim. The FDA has issued at least 9 warning letters informing food companies their products were misbranded because of the exact "0 grams Trans Fat" claim at issue here. (Ex. 1).  Defendants' assert that Plaintiffs' complaints are merely minor "technical" violations of FDA regulations, while the violations alleged in the AC would more accurately be characterized as serious and blatant. In fact, the types of violations at issue here resulted in numerous FDA warning letters which the FDA only issues for violations of "regulatory significance" where the violation was a significant violation. http://www.fda.gov/ICECI/ComplianceManuals/RegulatoryProceduresManual/ucm176870.htm.

The FDA's interpretation of its own regulations (in this case 21 C.F.R. § 101.13(h))  and its conclusion that Defendants 0g Trans Fat claims violate those regulations, are misleading and  and render products misbranded are "controlling" and must be given deference. Thus the Ninth Circuit has stated: "[w]e give wide deference to an agency's reasonable interpretation of its own regulation." *Public Lands for the People, Inc. v. United States Dep't of Agric.*, 2012 U.S. App. LEXIS 20175 (9th Cir. 2012).  "[W]here an agency interprets its own regulation, even if through an informal process, its interpretation of an ambiguous regulation is controlling under Auer unless 'plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006).

An agency's interpretation of its own regulations is entitled to still entitled to deference even if informal and even if non-binding or lacking the force of law. These interpretations not only include

agency letters, compliance guides and agency guidance, but also the FDA's published responses to commentators when enacting the regulations at issue. *See e.g., Schering Corp. v. FDA*, 51 F.3d 390, 399-400 (3rd Cir. 1995) (deferring to FDAs stated disagreement with commentators regarding appropriate measurement of bioequivalence).[45]

Despite the fact that Defendants' unlawful "0 Grams Trans Fat" claims have been the subject of FDA enforcement actions and the FDA has sent at least nine warning letters for unlawful 0 grams trans fat claims identical to the ones at issue here and other warning letters for similar unlawful nutrient content claims for failure to make the required disclosure of deleterious components required by 21 C.F.R. § 101.13(h), Defendants seem to think that all that matters is that they have not yet received warning letter. *See e.g.* Ex. 1. These letters confirm that 0 grams trans fat claims are nutrient content claims and that such unlawful claims misbrand the products that utilize them. According to the FDA's July 2012 Regulatory Procedures Manual:

> "The Warning Letter is the agency's principal means of notifying regulated industry of violations and achieving prompt voluntary correction." Moreover, as alleged in the AC, the FDA has specifically indicated that it has posted the warning letters at issue in the misbranding cases to inform food manufacturers of their legal obligations. The FDA stated that it intended that "the Warning Letters would clarify the FDA's expectations for food manufacturers as they review their current labeling." The FDA indicated that its expectation was that the companies that received warning letters take to correct their labels and that "t]he agency also anticipates that other firms will examine their food labels to ensure that they are in full compliance with food labeling requirements and make changes where necessary."

Notwithstanding the fact that its trans fat labeling claims are indisputably in violation of

---

[4] Courts have regularly taken judicial notice of FDA warning letters and guidance documents. *See Anderson v. Jamba Juice Co.*, 2012 WL 3642835, at *2 (N.D. Cal. Aug. 25, 2012); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (courts will take judicial notice of public record.). *See also, Von Koenig*, 713 F. Supp. 2d at 1073 (court took judicial notice of FDA warning letters, available on FDA website as matters of public record, in considering motion to dismiss); *Peviani v. Hostess Brands, Inc.*, 750 F. Supp. 2d 1111, 1116 (C.D. Cal. 2010) (court took judicial notice of FDA Food Labeling Guide); *Am. Farm Bureau v. U.S. E.P.A.*, 121 F. Supp. 2d 84, 106 (D.D.C. 2000) (Judicial notice taken of federal agency policies printed in Federal Register).

[5] Compliance Guidance and other agency pronouncements can, "as a practical matter, have binding effect" even if classified as non-binding. *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1021 (D.C. Cir. 2000). In Appalachian Power, the Court of Appeals found and held that EPA guidance documents were final agency documents subject to judicial review. The Court held that where an agency "acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies and interpretations formulated in the document… then the agency's document is for all practical purposes 'binding.'" *Id.* (citing and quoting Robert A. Anthony, Interpretive Rules, Policy Statements, Guidance's, Manuals, and the Like-Should Federal Agencies Use Them to Bind the Public?, 41 Duke L.J. 1311, 1328-29 (1992)).

California law, Defendants attempt to argue that it is not plausible that anyone could have been

misled by its failure. This attempt is unavailing for a number of reasons. First, as 21 C.F.R. § 1.21

which has been adopted by California provides that:

> [l]abeling of a food … shall be deemed to be misleading if it fails to reveal facts that
> are 1) Material in light of other representations made or suggested by statement,
> word, design, device or any combination thereof; or (2) Material with respect to
> consequences which may result from use of the article under: (i) The conditions
> prescribed in such labeling or (ii) such conditions of use as are customary or usual.

The FDA's published comments when enacting the final nutrient content claim disclosure

rule found the failure to make the mandatory disclosures when making a nutrient content claim like 0

Grams Trans Fat would be "misleading":

> FDA has the authority to issue this final rule regarding nutrient content claims under
> sections 201(n) (21 U.S.C. 321(n)), 403(a), 403(r), and 701(a) of the act. These
> sections authorize the agency to adopt regulations that prohibit labeling that: (1) Is
> false or misleading in that it fails to reveal facts that are material in light of the
> representations that are made with respect to consequences that may result from use
> of the food, or (2) uses terms to characterize the level of any nutrient in a food that
> has not been defined by regulation by FDA. 58 F.R. 2302, 2303.

> Section 403(r)(2)(B)(ii) of the act states that if a food that bears a nutrient content
> claim "contains a nutrient at a level which increases to persons in the general
> population the risk of a disease or health-related condition which is diet related,
> taking into account the significance of the food in the total daily diet, the required
> referral statement shall also identify such nutrient," i.e., a disclosure referral
> statement. FDA referred to this level as the "disclosure level" in the general
> principles proposal (56 FR 60425). In proposed § 101.13(h), FDA defined such
> levels for fat, saturated fat, cholesterol, and sodium, based upon an approach that
> considered dietary recommendations for these nutrients, the number of servings of
> food in a day, and available information on food composition. The proposed
> provision set out the required contents of the referral statement that would result. 58
> F.R. 2302, 2307.

> Under sections 201(n), 403(a), and 701(a) of the act, the agency could require the
> identification of nutrients that are present at levels that increase the risk of a disease
> or health-related condition in the absence of a claim. However, in the absence of a
> nutrient content claim, there would be no basis to conclude that consumption of the
> food would receive any particular emphasis as part of the total daily diet, and thus
> there would be no particular basis for concern, and hence for a warning, about the
> levels of fat, saturated fat, cholesterol, or sodium in the food.
> Only when the significance of the food in the total daily diet is highlighted, as it is
> when a nutrient content claim is made, does the level of these other nutrients
> become material not only for purposes of section 403(r)(2)(B)(ii) of the act but also
> for sections 201(n) and 403(a) of the act. 58 F.R. 2302, 2307.

> The disclosure statement is not intended to serve as a primary basis for making a
> purchase decision. However, if a nutrient content claim is made, the label must
> provide the consumer with the facts that bear on the advantages asserted by the

claim and with sufficient information to understand how the product fits into a total dietary regime. 58 F.R. 2302, 2307-08.

These interpretations include the FDA's published responses to commentators when enacting the regulations at issue. *See e.g., Schering,* 51 F.3d at 399-400. The FDA has maintained this view in subsequent comments on the rules:

> In addition, under section 403(r)(2)(A)(vi) of the act, the Secretary by regulation may prohibit a claim about the level of a nutrient because it is misleading in light of the level of another nutrient in the food. Section 403(r)(2)(B) of the act requires that the labeling of any food bearing a nutrient content claim that contains a nutrient at a level that increases to persons in the general population the risk of a disease or health-related condition that is diet related must contain, prominently and in immediate proximity to such nutrient content claim, a disclosure statement specified by that section of the act. 64 F.R. 62746, 62748.

Defendants avoid the fact that they failed to make the required disclosure on the front of their packaging. The disclosure requirements as required by 21 C.F.R. § 101.13(h) were imposed to prevent consumers from being misled as to the overall nutritional profile of foods by highlighting healthier aspects while less healthy aspects were concealed. The selective presentation by Defendants of the various nutrient content claim on the front of the package while failing to make front of package disclosures about the deleterious fat is the type of labeling practice that the FDA expressed "concern" about its "potential for product labeling to mislead consumers by presenting only 'good news' about nutrient content on the front of the package, which is the concern the regulations governing nutrient content claims were intended to address." (Ex. 2).  Because the "0 Grams Trans Fat" is clearly a nutrient content claim, Defendants were required under identical California and federal law to follow the disclosure of 21 C.F.R. § 101.13(h) and notify consumers on the front of the package that its products contained levels of fat levels the FDA at deemed sufficient to increase the risk of a diet related disease or condition. Failing to do so is misleading. As the FTC noted in its food advertising enforcement guide:

> As mandated by the NLEA, FDA's nutrient content labeling regulations require a number of disclosures. These mandated disclosures include, but are not limited to: ….disclosure of nutrients (fat, saturated fat, cholesterol, and sodium) present in a food at a level that FDA has concluded increases the risk of diet-related disease, required whenever a nutrient content claim is made.….In determining whether such disclosures are necessary to prevent deception, the Commission will consider several factors. First, the Commission will carefully evaluate nutrient content claims for foods that contain a nutrient at a level considered by FDA to increase the risk of a diet-related disease. When the context of an ad as a whole   conveys to consumers

the net impression that the food makes only positive contributions to a diet, or does not contain any nutrients at levels that raise the risk of diet-related disease, the failure to disclose the presence of risk-increasing nutrients is likely to be deceptive.

http://www.ftc.gov/bcp/policystmt/ad-food.shtm. Thus it is more than plausible that Defendants' failure to disclose such information on the front of its package is deceptive. It should be noted similar claims were at issue in the *Hershey* case where Hershey engaged in identical or very similar practices. As a result of this Court's order in Hershey in which it rejected all of Hershey's plausibility and reasonable consumer arguments, these claims remain live and viable in the *Hershey* case. Thus, Hershey continues to face claims arising from its failure to make the mandatory disclosures required by 21 C.F.R. § 101.13(h) when making a nutrient content claim like the trans fat claims made by Defendants. It is these same type of claims (albeit involving antioxidant nutrient content claims) that the Court allowed to proceed over plausibility and reasonable consumer arguments by Hershey that Defendants  now seeks to have this court dismiss on the same grounds.

Plaintiffs claim that Defendants' labels are unlawful and misleading. As Defendants know, even a label which is literally true may "nevertheless [be] deceptive." *People v. Wahl*, 30 Cal. App. 2d Supp. 771, 774 (Cal. App. Dep't Super Ct. 1940).

Defendants' arguments illustrate the fact-driven nature of the false advertising claim (and not the unlawful claim). Defendants' claim that a reasonable consumer could not possible be misled as they are advised to review the Nutrition Facts panel on the back of the product for more information. (Br. at 10-11). Although Defendant's seek to subvert its holding by cropping the quote, The Ninth Circuit has expressed a different view, having rejected the argument that a reasonable consumer would not be deceived by labeling because the some non- front of package portion of the product packaging specifically identified the product's ingredients. *See Williams*, 552 F.3d at 938 ("**We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead,** reasonable consumers expect that the ingredient list contains more detailed information about [*940] the product that confirms other representations on the packaging..")(bolded, italicized text cropped by Defendants). The extent to which Defendants deceived consumers is a question of fact.

Defendants vainly rely on *Delacruz v. Cytosport, Inc.*, 2012 WL 2563857 (N.D. Cal. June 28, 2012), in support of their argument that their "0 Grams Trans Fat" statement cannot be actionable. In *Delacruz*, Judge Wilken granted in part Cytosport's motion to dismiss. *Delacruz*, 2012 WL 2563857, at *10. In dismissing Delacruz's "0 Grams Trans Fat" claim, the Court found that Delacruz's "0 Grams Trans Fat" allegation was that the claim "distracts consumers from the products unhealthy fat and saturated fat content." *Id.* The court found and held that the "alleged distraction, however, does not amount to a false statement or misrepresentation and, thus, is not an actionable claim." *Id.* at *8.

*Delacruz* is distinguishable, however. There the plaintiff did <u>not</u> allege that the "0 Grams Trans Fat" violated the unlawful prong of California's Sherman Law. The "0 Grams Trans Fat" claim here is based on a claim that the label is not only misleading, but it is also unlawful and thus does not require misrepresentation or deception, merely injury from buying a product that could not be legally sold and had no economic value and which would not have been purchased had the unlawful action not occurred. (AC ¶¶ 41-61). Defendants make no effort to argue otherwise.

In *Delacruz*, Judge Wilken noted the distinction between claims based on violation of regulation and those not. Judge Wilken held that the "healthy" claim was actionable, noting that the applicable FDA requirements were "objective standards" which were violated by Cytosport. *Id.* Plaintiffs' "0 Grams Trans Fat" claims here are like the "health" claims that Judge Wilken found and held to be actionable in *Delacruz*. As in *Delacruz*, Plaintiffs have stated unlawful claims, based on Defendants' violation of FDA requirements and California's Sherman law, which are actionable as "unlawful" and "misleading." *Delacruz* does not support dismissal of Plaintiffs' claims, but rather supports denial of Defendants' motion. Moreover, *Delacruz's* holding with respect to whether misrepresentation was plausible is infirm (1) because it is inconsistent with the repeated holding of the Courts of the Northern District, including this Court, that misrepresentation and plausibility are fact issues that should not be resolved at the pleading stage; and (2) because the *Delacruz* Court was not presented with and thus did not evaluate 21 C.F.R. § 1.21 which establishes that a violation of the disclosure rules is *per se* "misleading" nor did it evaluate any of the other regulatory materials and FDA interpretations of its own regulations that are controlling on this Court and which clearly

establish the misleading nature of Defendants' unlawful 0 g Trans Fat claims.

Defendants contend that Plaintiffs' "0 Grams Trans Fat" claim is implausible, and even if plausible, preempted. (Br. at pp. 8-13). The plausibility analysis that Defendants suggest has been repeatedly rejected by this Court as not properly within Rule 12(b)(6) and as such involves questions of fact. The preemption argument simply fails upon examination of the regulations adopted by California through the Sherman law. Plaintiffs do not seek to impose any restriction different from governing California law.

Defendants apparently do not deny and therefore admit that their current (and prior) "disclosure" fails to comply with California law, but rather characterize the regulatory violation as merely "technical." (Br. at 8). This argument is strained in light of the large body of FDA guidance and warning letters reflecting the importance of the law adopted by California.

Defendants' argument that no reasonable consumer could plausibly be misled by its "disclosure" is even more surprising in that their current disclosure misdirects consumers to saturated fat, a nutrient in which their product is low, while failing to direct consumers to the harmful levels of total fat, which Defendants are mandated by law to disclose (AC ¶ 84). Defendants make no effort to explain why they now choose to direct consumers to saturated fat instead of total fat (the nutrient in which the product is high and deleterious).

Defendants seem to suggest Plaintiffs have misquoted the regulations adopted by California. As stated in Plaintiffs' AC, 21 C.F.R. §101.13 specifically provides that where a disclosure is required, as here, the food "must bear a statement disclosing that the <u>nutrient exceeding the specified level</u> is present in the food…" (emphasis added).

The regulation further prescribes the language of the required disclosure:

> See nutrient information for _____ content with the blank filled in with the identity of the nutrient exceeding the specified level, e.g., "See nutrition information for fat content."

The governing regulation clearly mandates that manufacturers identify the nutrient which exceeds the specified level, not the nutrient which does not exceed the specified level. Defendants' argument completely fails to address how this violation is merely "technical". As discussed

hereinabove, the extensive body of FDA guidance documents and warning letters concerning the strict rules related to "0 Grams Trans Fat" claims reflects that both the federal government and California consider these violations to be serious. California has chosen to adopt these regulations as governing law and reasonably expect manufacturers to simply comply.

Defendants cite cases they contend illustrate "common sense legal principles" that should control this case. (Br. at 9). Neither case has persuasive application here. *Polk v. KV Pharm. Co.*, 2011 WL 6257466 (E.D. Mo. Dec. 15, 2011) involved pharmaceutical claims that the product was defective and involved application of Missouri and Texas law. Likewise, *Loreto v. Procter & Gamble Co.*, 737 F. Supp. 2d 909 (S.D. Ohio 2010) does not help Defendants. In *Loreto*, plaintiffs sought a class action against a cold medicine manufacturer under Ohio and New Jersey consumer protection and deceptive trade practices acts. Finding and holding that the plaintiffs were attempting to enforce a private right of action under the FDCA, the court dismissed the claims. *Loreto*, 737 F. Supp. 2d at 922. Here Plaintiffs seek a common sense application of California law by simply applying a clear rule. Defendants assert that a reasonable consumer is not aware of "arcane" FDA regulations and therefore could not be deceived by what they falsely characterize as "technical" violations of the regulations. This argument was rejected by Judge Davila in *Hershey*, at *7.[6]

---

[6] Defendants cite *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 475 F. App'x 113 (9th Cir. 2012) for the proposition that no reasonable consumer would be deceived by their labels (Br. at 9). In fact, the Ninth Circuit found and held that these claims ("original" or "classic" ice cream) could not deceive consumers into believing that Dreyer's ice cream was "healthier than its competitors . . ." *Carrea*, 475 F. App'x at 115. In *Carrea*, these statements did not convey any nutrition or health claim and were not violative of federal and state regulations, as here. *Carrea* is not persuasive in this respect. It is notable, however, that Plaintiffs' claims involve express nutrient claims which are prohibited as a matter of law. (AC ¶¶ 41-61). In *Carrea*, the Ninth Circuit affirmed the trial court's dismissal of "0 Grams Trans Fat" claims made by the plaintiff because the statement was expressly permitted by federal law. *Carrea*, 475 F.App'x at 115. Here, the statements are expressly prohibited and support a judgment as a matter of law, which Plaintiffs intend to seek as soon as practicable. It is important to note that notwithstanding Defendants' attempt to confuse matters and lead the Court into error, the *Carrea* 0 g Trans Fat claims are completely different and unrelated to the 0 g Trans Fat claims at issue here. In *Carrea*, the Plaintiff sought to enjoin a 0 g Trans Fat claim on products containing minor amounts of Trans Fat that the law specified should be rounded down to 0 g and thus sought to impose a non-identical state law requirement. Such a claim was properly preempted. In contrast, here the Plaintiffs challenge the Defendant utilization of a 0 g nutrient content claim in express violation of the disclosure requirements of 21 C.F.R. § 101.13(h) adopted by the State of California. Such a claim is not subject to preemption as it is identical to the federal requirement which it simply incorporates, as demonstrated by the FDA's repeated efforts to stamp out practices like those challenged by the Plaintiff.

1

2.      **"No MSG" Claim**

2          Defendants argue that Plaintiffs' "No MSG" claims are preempted. (Br. at 13).[7]  Defendants

3      are simply wrong.  California's Sherman law, by adopting the federal regulations in their entirety

4      including those that prohibit labeling that is misleading in any particular, prohibits "No MSG" claims

5      on packaging of products which contain any ingredient that naturally contains MSG.  Defendants

6      seek to rely on regulations describing how MSG is to be identified in the ingredient statement which

7      is an entirely different  issue unrelated to whether it is unlawful and misleading from placing a "no

8      MSG" statement on a product whose component ingredients contain MSG or free glutamates.

9      Defendants' argument that the No MSG rule relied on by Plaintiff was merely proposed by the FDA

10     in 1995 but never adopted by the FDA is completely refuted by the current FDA website section on

11     MSG which is dated "November 19, 2012" and which states in the section concerning how

12     consumers can know if there is MSG in their food:

13              FDA requires that foods containing added MSG list it in the ingredient panel on the
                packaging as monosodium glutamate. However, MSG occurs naturally in ingredients
14              such as hydrolyzed vegetable protein, autolyzed yeast, hydrolyzed yeast, yeast extract,
                soy extracts, and protein isolate, as well as in tomatoes and cheeses. While FDA
15              requires that these products be listed on the ingredient panel, the agency does not
                require the label to also specify that they naturally contain MSG. However, foods
16              with any ingredient that naturally contains MSG cannot claim "No MSG" or "No
                added MSG" on their packaging.
17

18     http.://www.fda.gov/Food/FoodIngredientsPackaging/ucm328728.htm. (attached as Ex.3).

19     As alleged in the AC in paragraph 64, the FDA has made it clear that it is "misleading" to utilize a

20     "no MSG claim" when ingredients contain MSG or free glutamates. The FDA has indicated that

21     "consumers frequently use the term MSG to mean all free glutamate" and therefore "[f]or this

22     reason, FDA considers foods who labels say "No MSG" or "No Added MSG" to be misleading if

23     the food contains ingredients that are sources of free glutamates, such as hydrolyzed protein." *See* Ex.

24     4.  Despite this guidance, the Defendants engaged in exactly the practice the FDA warned was

25     "misleading" to consumers.

26     _____

27     [7] Defendants also contend that Plaintiffs have not alleged that the chip products "are falsely labeled because
       they <u>do</u> contain MSG." (Br. at 13).  In fact, Plaintiffs do allege that the labels on Defendants' products "were
28     false as the products contained MSG." (AC ¶ 66).  Plaintiffs specifically allege that any reasonable consumer
       would interpret a "No MSG" label to mean just that.  Defendants do not deny that the products indeed
       contain MSG or free glutamates.

Defendants claim that Plaintiffs' claim amounts to a challenge of FDA's MSG labeling regulations (Br. at 14). This is not true. Plaintiffs seek to have California law, identical to the FDA regulations, enforced and applied. Defendants cite *Truth In Labeling Campaign v. Shalala*, 999 F. Supp. 1289 (E.D. Mo. 1998). *Shalala* is distinguishable. In *Shalala*, the consumer plaintiffs challenged the validity of the FDA's regulation which requires that MSG be identified on a food label when MSG is added to the food in a "single ingredient form" as being inadequate. *Id.* at 1290. The plaintiffs argued that the regulation was arbitrary and capricious because it did not require manufacturers to disclose MSG where it was added as a component of another food product. The Court noted the 'No MSG" rule when considering whether the ingredient listing regulations were "inconsistent with the FDA's regulation prohibiting a claim of "No MSG" or "No MSG Added" from being included on a food label if MSG is present regardless [of] whether it was added as a single ingredient or was a component of another ingredient" *Id.* at 1297. While the Court rejected the challenge to the ingredient listing rules as they pertained to MSG, *Shalala* did <u>not</u> hold that a manufacturer may claim "No MSG" where it is present. As quoted above, the FDA has expressly distinguished between the ingredient labeling rules of 21 C.F.R. § 101.22 applicable to MSG and the rule prohibiting manufacturers from misleading consumers like the Defendants did by placing "No MSG" or "No added MSG" on their product packaging or labeling when they contain any ingredient that naturally contains MSG such as yeast extract utilized by Defendants.[8]

---

[8] Defendants' argument is also belied by the original developer and leading producer of MSG which states on its website which the Court can judicially notice:

> Some manufacturers use "clean labels", i.e., labels that contain only ingredient names they think consumers will not recognize as containing MSG -- names such as "hydrolyzed soy protein", "yeast extracts," etc., while others advertise "No MSG," "No MSG Added," or "No Added MSG," even though their products contain MSG. Placing "No MSG," "No MSG Added," or "No Added MSG" on food labels has been deemed by the USFDA to be false and misleading under Section (403)(a)(1) of the Federal Food, Drug and Cosmetic Act when the label also lists any form of hydrolyzed protein as an ingredient (since it contains MSG). USFDA announced in 1995 that "...FDA considers foods whose labels say "No MSG" or "No Added MSG" to be misleading if the food contains ingredients that are sources of free glutamates, such as hydrolyzed protein, yeast extracts, cheese, tomato, etc. Thus, to advertise "No MSG," "No MSG Added," or "No Added MSG" when there is processed free glutamic acid in a product is not right. Those making such claims should be able to demonstrate, through valid tests for free glutamic acid content, that there is no (zero) free glutamic acid in their products. However, in reality, it is almost impossible for regular products/ingredients not to contain free glutamic acid. Although a product may claim it does not contain any MSG or MSG-containing ingredients, any ingredients that contain even a bit of protein can be hydrolyzed (through heat, enzymes, acid, etc), causing free glutamic acid (and thus, MSG) to be released.

Plaintiffs' claims are <u>not</u> that all sources of MSG must be labeled MSG.  Plaintiffs' claims are that label claims of "No MSG" are unlawful and misleading where MSG is present.  *Shalala* is inapposite.  FDA's guidance found on its current website reflects that Plaintiffs claims are valid and not preempted.  Such claims have also been the subject of FDA warning letters. *See* Ex. 5.  Plaintiffs do not seek to impose any requirement that is inconsistent with California law, which mirrors the federal regulations. Defendants argument that 21 CFR § 101.22 whose applicable provisions were enacted in 1993 somehow represents a rejection of unbroken policy the FDA has followed since 1995 and maintains to this day not only defies logic but it is misplaced because 21 CFR § 101.22 deals with ingredient lists and the FDA's No MSG policy focuses on when it is misleading to use that term outside of the ingredient list. While, Defendant ignores the FDA's current (November 19, 2012) statement of its No MSG policy on its website, and tries to argue that the 1995 expression of this same policy was merely a "brochure," this is unavailing. An agency's interpretation of its own regulations is entitled to still entitled to deference even if informal and even if non-binding or lacking the force of law. *Public Lands for the People, Inc. v. United States Dep't of Agric.*, 2012 U.S. App. LEXIS 20175 (9th Cir. 2012). Thus the Ninth Circuit has stated "where an agency interprets its own regulation, even if through an informal process, its interpretation of an ambiguous regulation is controlling under *Auer* unless 'plainly erroneous or inconsistent with the regulation.'" *Id.* (*quoting Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006).

Defendants' argument that no reasonable consumer could be misled by a no MSG claim when component ingredients contained MSG is particularly misplaced when the FDA has termed Defendants practices' "misleading" and even the precedent cited by Defendants notes multiple health related complications from ingesting MSG.[9] As noted in the AC at paragraph 59, Defendants admit

---

http://www.ajinomoto.com.sg/faq.html

[9] Two types of responses have been described following human ingestion of [MSG]. In the first, symptoms normally identified as allergic symptoms are experienced by individuals sensitive to the raw materials from which the glutamate is prepared, e.g., beets, corn or wheat. The second is [MSG Symptom Complex 11], first reported in 1968. Apparently this syndrome appears in sensitive individuals within 5 to 35 minutes after consuming, on an empty stomach, foods containing on the order of several grams of added [MSG]. In order of frequency of appearance, the signs and symptoms include: a sensation of tightness in the back of the neck; a feeling of pressure behind the eyes; frontal or temporal headache; drowsiness, facial flushing, sweating, nausea, a feeling of pressure on the side of the face, thirst, pressure, and burning sensations in the chest; and abdominal pain. These manifestations are transient, usually lasting for less than 1 hour; however, headache

that "[s]ome people report sensitivity to MSG and prefer to avoid foods containing MSG." Plaintiffs alleged they relied on the Defendants' No MSG claims and would not have bought the products had they known the products were ineligible to make such claims because of the presence of MSG in the component ingredients. (AC ¶ 59-72, 149-60).

### 3. Websites Referenced On Product Labels Constitute Labeling

Defendants' argument that their unlawful website claims were not part of their products label is meritless because the labels of the Defendants' products contained the internet address of Defendant's website and thus under law both the referenced website and any linked websites were both product labeling and an extension of the products' labels. Plaintiffs alleged that Defendants labels and labeling contained unlawful claims and statements. While 21 U.S.C. § 321(k) defines the term "label," 21 U.S.C. § 321(m) defines the term "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." If the label for a product contains a statement that refers the consumer to a specific website for additional information about a claim for the product, the website is "labeling." The website, in this case, is considered written, printed, or graphic matter that supplements or explains the product and is designed for use in the distribution and sale of the product. The FDA has confirmed the meaning of this section and stated that websites are indeed part of a products' labeling.

Because Plaintiffs have pleaded repeatedly that they saw and relied on both the labels and labeling of Defendants' misbranded products and specifically referenced Defendants' websites, those allegations are sufficient to pursue claims based on website claims for websites referenced on product labels or websites that websites referenced on product labels direct visitors to, both of which constitute labeling according to the FDA.

### 4. Claims Related To Sodium Content

In light of the fact that Defendant's unlawful low sodium claims were made on the website referenced on the labels of the products bought by Plaintiffs and thus constitutes labeling, Defendants contention that the "low sodium" claims should be dismissed because they do not

---

may occasionally persist for as long as 5 hours. *Shalala*, 999 F. Supp. 1289, 1293 (E.D. Mo. 1998)(brackets in original)

appear on their products label is specious.  Defendants try to obscure this fact by falsely claiming that there is no allegation that the low sodium claim appeared on product labeling when this exact allegation is repeatedly made in the AC (AC ¶¶ 102, 105, 107, 152-53). For example, Plaintiffs alleged (AC ¶ 107) they were "misled into purchasing Defendants' purportedly 'low sodium' products that actually contain levels of sodium higher than the maximum upper limit for a 'low sodium' product and that are not 'low sodium' as falsely represented on ***their labeling*** and in their marketing materials."  Defendants also falsely assert that Plaintiffs fail to specify the source, medium or other identifying information ignoring Plaintiffs repeated references in the AC (AC ¶ 102, 105, 107, 152-53) to the Defendants' product labeling and websites.  Most egregious is Defendants' outrageous quote cropping to hide the actual low sodium claim at issue so as to disingenuously argue that no low sodium claim was made on product labeling. Defendants crop the italicized text from the Frito-Lay "salt/sodium" section http://www.fritolay.com/your-health/explaining-ingredients.html cited in AC ¶101:

> "Snack chips are actually not as high in sodium as most people think***…[i]n fact a serving of most Frito-Lay snack chips … has three times less sodium than a bowl of low sodium soup."***

Moreover, in falsely arguing that they complied with the low sodium rules of 21 C.F.R. § 101.61 which imposes a 140 mg cutoff of for low sodium claims, Defendants ignore the allegations in AC ¶¶ 100-09 including the remainder of AC ¶101  which states:

> This is simply a false statement. By definition "low sodium" soup could not contain more than 140 mgs of sodium per serving (which is 8 ounces). Three times less than this would thus be no more than 47 mgs of sodium. In fact, the sodium levels of most, if not all, of the Defendants' snack chips were far in excess of this level with many such as the ones bought by the Plaintiffs being approximately 2 to 5 times more than this.

For these reasons, Plaintiffs' low sodium allegations (AC ¶¶ 100-09) should not be dismissed because Defendants' labeling and website references to "low sodium," incorporated into the label, are unlawful under California law.

### 5.    Claims Related To "Nutrient" Content

Given that labeling includes websites referenced on labels, Defendants' contention that Plaintiffs' nutrient content claims should be dismissed because certain nutrient content claims were

not found on product labels is unavailing. Plaintiffs alleged that unlawful nutrient content claims were made on product labeling and websites (*See e.g.* AC ¶¶ 152-53)   Similarly, Defendants' false statement that Plaintiff failed to provide "details" about the nutrient content claims at issue is only possible because Defendants ignore the parts of the AC such as AC §4-5, 111-15) where these claims are not only detailed but quoted and a labeling product brochure is even depicted.   Plaintiffs specifically identify statements made by the Defendants that "Frito-Lay snack chips and nuts 'contain' mostly 'good fats' but good fats are a nutrient without [an] RDI or DV…"  (AC ¶ 112). This claim was found on the product labeling brochure located on Defendants' website and included as a scan in paragraph 5 of the AC (attached as Ex. 7). Plaintiffs' AC identifies specific statements by Defendants that their potatoes and corn snack products contribute "nutrients like iron, thiamin, magnesium, and niacin" as well as a number of other nutrient content claims that are quoted all of which are unlawful and misleading. (AC ¶¶ 4, 114). For example, Plaintiffs alleged that Defendants made a number of nutrient content claims stating that their snacks or the snacks ingredients were "packed" or "sources" of specified nutrients despite failing to meet the minimum DV for these nutrient content claims to be legal under 21 C.F.R. 21 C.F.R. §§ 101.13 and 101.54.  (AC ¶¶ 4-5, 110-19). Plaintiffs' AC has alleged that Defendants have unlawfully labeled and advertised their products with unauthorized and prohibited claims.

### 6.    Defendants' Unlawful Health and "Healthy" Claims

Defendant do not challenge the Plaintiffs' allegations that Defendants made unlawful health claims in violation of 21 C.F.R. § 101.14 (AC ¶¶  120-24, 128-34, 152) and thus should be deemed to have waived any argument that allegations that Defendants' product labeling and websites promoted the ability of Defendants snacks to prevent cancer, heart disease, diabetes and other medical conditions.  In the AC (AC ¶¶ 120-24, 128-34, 152) Plaintiffs' specifically alleged these claims were located on Defendants' product labeling and websites and quoted specific examples they relied on such as:

> Defendants make a number of unlawful health related claims. For example,
> Defendants claim that the ingredients in all of its chips "support heart health and
> "that "the healthier oils … used in all Frito-Lay snack chips, are high in
> polyunsaturated and monounsaturated fats that have been proven to reduce LDL

(bad) cholesterol and maintain HDL (good) cholesterol levels, which have been associated with a reduction in the risk for heart disease. "Defendants also suggest that snacking on their products can have a beneficial or preventive effect on other diseases and conditions such as diabetes, hypoglycemia, gastric emptying or dumping syndrome.

Moreover in paragraph 5 of the AC, Plaintiffs included a scan of the product labeling brochure for the Classic Lay's potato chips purchased by both plaintiffs which included a number of the unlawful health claims alleged and stated:

All Lay's Classic potato chips are cooked in healthier oils like sunflower oil, canola oil and corn oil, which are high in polyunsaturated and monounsaturated fats (the "good" fats), lower in saturated fat and contain 0 grams of trans at (the "bad" fats). Polyunsaturated and monounsaturated fats have been shown to lower total and LDL (bad) cholesterol and maintain HDL (good) cholesterol when they  replace saturated fats in the diet and caloric intake is maintained. This change in cholesterol can help reduce the risk for heart disease.

Defendants' contention that Plaintiffs have not specifically identified where their "healthy" claims appear cannot withstand scrutiny.  In fact, Plaintiffs' AC alleges specifically that Defendants have made both types of claims on their website and that the website is noted on the Defendants' label packaging. (AC ¶¶ 4-5,120-134, 152-53). As discussed above, websites are labeling and an extension of the label, where they are noted on the product label. In particular, in paragraph 5 of the AC (attached as Ex. 6), Plaintiffs include a scan of the product labeling brochure for the Lay's Classic potato chips purchased by both Plaintiffs which includes a number of the challenged unlawful "healthy" claims and which utilizes the terms health, healthy, and healthier at least six times as implied nutrient content claims in violation of 21 C.F.R. § 101.65(d) which forbids the use of such terms in connection with products like Defendants' potato chips that have a disqualifying nutrient such as fat at a disqualifying high level deemed by the FDA to pose a risk of a diet related disease or condition as specified in 21 C.F.R. § 101.13(h). Defendants' argument is essentially a Rule 9(b) argument that Plaintiffs' AC lacks specificity. Plaintiffs' response to the Rule 9 argument is more specifically set forth herein.  The allegations of Plaintiffs' AC are sufficiently pleaded with particularity to satisfy Rule 9(b) and any insufficiency would, at most, be properly addressed by amendment.

### 7.    Claims related to "All Natural"

In perhaps their most disingenuous argument, Defendants contend that their utilization of a "Made With All Natural Ingredients "claim on products containing artificial and synthetic ingredients and unnatural added colors is accurate and therefore not actionable because at least some of the ingredients were natural.  (Br. at 17).  This argument is meritless for a variety of reasons not the least of which it is directly contradicted by the Defendants' own statements as quoted in the AC. (AC ¶ 44).  Defendants' argument is not only contrary to common English usage, it is also contrary to precedent.  Natural or all natural or 100% natural claims are not subject to dismissal on the theory that a reasonable consumer would not be mislead. For instance, in *Dreyer's*, the court denied a motion to dismiss where plaintiff argued that a reasonable consumer could interpret all natural flavors to mean —all natural ingredients, and thus free of any synthetic and/or artificial ingredients. *Dreyer's*, 2012 U.S. Dist. LEXIS 101371 at *19-21.  Moreover, Plaintiffs' "All Natural" claims are based on allegations that the claims are unlawful and misleading.  (AC ¶¶ 45-58). Defendants' argument completely ignores the allegations and fact that California law and FDA policy prohibits the use of "All Natural" claims on products containing artificial or synthetic ingredients or added colors regardless of source. In its rule-making and warning letters to manufacturers, the FDA has repeatedly stated its policy to restrict the use of the term "natural" in connection with added color, synthetic substances and flavors as provided in 21 C.F.R. § 101.22 which has been adopted by California.

The FDA has also repeatedly affirmed its policy regarding the use of the term "natural" as meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food.  The FDA considers use of the term "natural" on a food label to be truthful and nonmisleading when "nothing artificial or synthetic…has been included in, or has been added to, a food that would not normally be expected to be in the food." *See* 58 FR 2302, 2407, January 6, 1993. Any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources. Further, the FDA distinguishes between natural and artificial flavors in 21 C.F.R. § 101.22. Defendants' "All Natural" labeling practices violate FDA Compliance Policy Guide Sec. 587.100, which states: "[t]he use of the words 'food color

added,' 'natural color,' or similar words containing the term 'food' or 'natural' may be erroneously interpreted to mean the color is a naturally occurring constituent in the food. Since all added colors result in an artificially colored food, we would object to the declaration of any added color as 'food' or 'natural.'" Likewise, California Health & Safety Code § 110740 prohibits the use of artificial flavoring, artificial coloring and chemical preservatives unless those ingredients are adequately disclosed on the labeling.(AC ¶ 48). Plaintiffs have alleged, and Defendants do not appear to deny, the allegations that Defendants use artificial and unnatural maltodextrin, ascorbic acid and citric acid and caramel color in the products, which precludes the lawful use of "All Natural" claims.  As noted in Plaintiffs' AC, the FDA has made clear in its Compliance Policy Guide Sec. 587.100 and in its warning letters to other food manufacturers that the "All Natural" label is unlawful where such artificial or synthetic ingredients or added colors regardless of source are present.  The FDA has sent out numerous warning letters concerning this issue.

## IV.    PLAINTIFFS' AMENDED COMPLAINT COMPLIES WITH RULE 9(B)

Rule 9(b) requires only that allegations of fraud be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Brooks v. ComUnity Lending, Inc.,* 2010 U.S. Dist. LEXIS 67116, at *27 (N.D. Cal. Jul. 6, 2010). Rule 9(b) "must be read in harmony with (Rule) 8's requirement of a 'short and plain' statement of the claim." *Baas v. Dollar Tree Stores, Inc.,* 2007 U.S. Dist. LEXIS 65979, at *5 (N.D. Cal. Aug. 29, 2007).  Plaintiffs need not, however, plead with particularity their § 17200 unlawful business practices claims. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 105-06 (9th Cir. 2003).

Defendants' brief belies any argument that Defendants are unable to defend against Plaintiffs' allegations. Plaintiffs here have pled the required "who, what, when, where, and how" of Defendants' alleged deception. *See, Colucci*, 2012 WL 6737800, at *7.[10]  On allegations far less detailed than those

---

[10] In fact, Plaintiffs' 53-page AC pleads far more detail than required by Rule 9(b): The "who" is Defendant PepsiCo, Inc. and Defendant Frito-Lay (AC ¶¶ 2,3, 18-19).  The "what" is discrete types of unlawful and deceptive claims by Defendants: (1) unlawful "All Natural" claims (AC ¶¶ 41-58); (2) unlawful "0 Grams Trans Fat" claims (AC ¶¶ 82-99; (3) unlawful nutrient content claims (AC ¶¶ 110-119); (4) unlawful health claims (AC 120-134). The "when" is "within the last four years." (AC ¶¶ intro para., 161).  The "where" is Defendants' package labels and website. (AC ¶¶ 2-6). The "how the statements were misleading" is that: (1)

here, this Court and others have repeatedly refused to dismiss under Rule 9(b). *See, e.g., Williams*, 552 F.3d at 939; *Vicuna v. Alexia Foods, Inc.,* 2012 WL 1497507, at *2 (N.D. Cal. April 27, 2012) (J. Hamilton); *ConAgra,* 2012 WL 6569393.

Defendants contend that Plaintiffs' AC should be dismissed because it does not identify the stores at which they purchased the products or how frequently they made the purchases. In *Conagra,* Judge Breyer rejected similar "when and where" arguments, finding and holding that "allegations that they bought the products in California since 2008 is sufficient to put Defendant on notice of the claims against it." *Conagra,* 2012 WL 6569393, at *11. As in *Conagra,* Plaintiffs' allegations are sufficient to place Defendants on notice of the claims against them.[11]

## V.   PLAINTIFFS HAVE PROPERLY PLEADED UNJUST ENRICHMENT

Defendants argue that Plaintiffs have failed to state a claim for unjust enrichment because they have otherwise failed to state any claim for relief. (Br. at 17). This Court rejected Defendants' arguments in *Colucci,* 2012 WL 6737800, at *10 ("claims for restitution or unjust enrichment may survive the pleading stage when pled as alternative avenue of relief"). Plaintiffs in this case have alleged the elements of an unjust enrichment restitution claim. (AC ¶¶ 246-249). Plaintiffs have alleged that Defendants were enriched, *i.e.*, received a benefit, by means of unlawful, fraudulent and misleading labeling. (AC ¶ 239).[12] Thus, Plaintiffs have properly pleaded an unjust enrichment claim[13]

---

Defendants violated the Sherman Law in specific ways, on their website and on the labels of their chip and snack products, as described above and in AC ¶¶ 1-2, (2) Plaintiff purchased Defendants' products reasonably relying, in substantial part, on Defendants' misrepresentations; and (3) Plaintiff was thus deceived by Defendants' product labels and website. (AC ¶¶ 149-160).

[11] Defendants' Rule 9 arguments are also problematic in that the allegations in Plaintiff Markus Wilson's original Complaint were sufficient to place Defendants on notice of the claims and file an answer. For instance, defendants admitted that various statements made on their website "speak for themselves" (¶¶ 4, 35 of Defendants' Answer).

[12] Plaintiffs may plead a restitution claim in the alternative, pursuant to Fed. R. Civ. P. 8(e)(2), even where such a claim is inconsistent and incompatible with a related claim for breach of contract or a claim in tort. *Vicuna,* 2012 WL 1497507, at *3.

[13] Defendants argue that Plaintiffs have not identified any written warranty and rest entirely on federal law. Defendants' written warranties emanate from and are governed by both federal and California law. California law provides substantive rights and remedies to Plaintiffs, and Plaintiffs' AC seeks relief based on California law. Plaintiffs have alleged sufficient facts to maintain claims under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 *et seq.* and the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

1

**CONCLUSION**

2        For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

3    motion in its entirely.

4        Dated:  January 9, 2013.

                                        Respectfully submitted,
5

6                                        /s/ Pierce Gore
                                        Pierce Gore (SBN 128515)
7                                        PRATT & ASSOCIATES
                                        1871 The Alameda, Suite 425
8                                        San Jose, CA 95126
                                        Telephone: (408) 369 0800
9                                        Fax: (408) 369-0752
                                        pgore@prattattorneys.com
10
                                        David McMullan, Jr. (MBN 8494)
11                                       Don Barrett, P.A.
                                        P.O. Box 927
12                                       404 Court Square
                                        Lexington, MS 39095
13                                       Telephone: (662) 834-2488
                                        Fax: (662) 834-2628
14                                       dmcmullan@barrettlawgroup.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28